UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYSON MEYER,

      Plaintiff,                                   Civil Action No. 14-13117

v.                                     HON. VICTORIA A. ROBERTS
                                          U.S. District Judge
                                          HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Tyson Meyer ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Income Benefits ("SSI") under the Social Security Act.   Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

      On October 12, 2011, Plaintiff filed applications for DIB and SSI, alleging disability as of January 1, 2005 (Tr. 176-182, 184-189).  After the initial denial of the claim, he filed

-1-

a request for an administrative hearing, held on April 3, 2013 before Administrative Law Judge ("ALJ") Earl Ashford (Tr. 49).   Plaintiff, represented by attorney Karlan Binder, testified (Tr. 53-69), as did Plaintiff's father, Ralph Meyer (Tr. 69-74), and vocational expert ("VE") Charles McBee (Tr. 74-77).  On June 4, 2013,  ALJ Ashford determined that Plaintiff was not disabled (Tr. 43).  On June 17, 2014, the Appeals Council denied review of the application (Tr. 1-3).  Plaintiff filed for judicial review of the Commissioner's decision on August 13, 2014.

## BACKGROUND FACTS

Plaintiff, born, January 13, 1976, was 37 at the time of the administrative decision (Tr. 43, 176).  He completed a GED and worked previously as a heavy equipment operator and siding installer (Tr. 214).  His application for benefits alleges disability as a result of cognitive deficits due to a car accident, back problems, leg numbness, depression, and schizoaffective and personality disorders (Tr. 213).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

He lived with his father in Tecumseh, Michigan since being released from prison in the summer of 2011 (Tr. 53-54).  He stood 5'10" and weighed somewhere between 230 and 250 pounds (Tr. 54).  He currently received food stamps and cash assistance from the State of Michigan (Tr. 55).

Plaintiff was unable to work due to "terrible" left leg pain and numbness (Tr. 55).  The

-2-

left leg problems caused him to fall (Tr. 55). He experienced a lesser degree of pain and numbness in the right leg (Tr. 56). He also experienced shooting pains in the right arm and finger numbness (Tr. 56). On a scale of one to ten, he typically experienced level "seven" right upper extremity pain (Tr. 56). He experienced problems gripping with the right hand (Tr. 56-57). He could lift a gallon of milk with his left hand (Tr. 57). He was unable to stand for any length of time (Tr. 57). Even with the use of a walker, he was unable to walk more than five or six steps at a time (Tr. 58). He required help bathing and tying his shoes (Tr. 59). He used a wheelchair to move from the couch to the bathroom (Tr. 60). He took Tramadol, Motrin, and Lyrica for his physical problems (Tr. 60). Tremors of the legs and hands had been reduced by medication (Tr. 61).

Plaintiff experienced depression, anxiety, and auditory hallucinations (Tr. 62-63). The "voices" encouraged him to hurt himself but he was able to "fight them off" (Tr. 63). Psychotropic medication helped him cope with the hallucinations (Tr. 64, 66). He also experienced concentrational problems and difficulty in social interaction (Tr. 64-65). He left the house only for doctors' appointments and to grocery shop (Tr. 65). He did not drive and was always accompanied by his father (Tr. 65). He did not experience medication side effects (Tr. 66).

Plaintiff was able to prepare simple meals but did not perform household chores (Tr. 67). He opined that he would be unable to work due to his inability to interact with others and his physical restrictions (Tr. 67).

-3-

**B.     Testimony by Plaintiff's Father**

Ralph Meyer ("Mr. Meyer") testified that Plaintiff had been living with him since being released from a halfway house (Tr. 69-70). He stated that he took Plaintiff to all of his medical appointments and monitored Plaintiff's medication dosage (Tr. 70). Mr. Meyer testified that he was Plaintiff's "payee" for the state assistance because "Social Services" thought that he would be "a trustworthy person" (Tr. 70-71). He stated that Plaintiff experienced short term memory problems, social anxiety, and had to be reminded to bathe regularly (Tr. 72-73).

**C.     Medical Evidence**

**1.     Records Related to Plaintiff's Treatment**

May, 2009 imaging studies of the testes were unremarkable (Tr. 277). August, 2009, Michigan Department of Corrections ("MDOC") records state that Plaintiff was referred to the a voluntary "Corrections Mental Health Program" (Tr. 940, 980). Treating staff noted average intelligence, a short attention span, and average appearance (Tr. 931). He attributed his memory problems to a recent car accident (Tr. 930-931). He was deemed a "low risk" for suicide (Tr. 977). He denied current auditory or visual hallucinations but admitted to a compulsion for biting his nails (Tr. 930, 976). He reported that he experienced back, leg, and testicular pain (Tr. 926). Treating notes state that he was "doing well" on current medication (Tr. 968). He exhibited a normal gait (Tr. 964). He exhibited "shaking throughout" a doctor's appointment until the physician "distracted him with questions and

exam" (Tr. 962).  A physical examination was unremarkable (Tr. 960-961).  Later the same month, Plaintiff was seen for emergency treatment, exhibiting "uncontrollable spasms" (Tr. 904, 920).  Treating staff noted that while Plaintiff shook "intentionally" in front of others, "he did not exhibit [such] behavior" when he believed he was alone (Tr. 916).  Plaintiff repeatedly asked for a wheelchair (Tr. 916).  Imaging studies of the cervical spine showed "mild muscle strain" (Tr. 914).

September, 2009, MDOC records state that Plaintiff exhibited "extreme nervousness" and body shakes of unknown etiology (Tr. 871-872, 879).  Norman E. Alessi, M.D. observed extreme memory impairment and a poor knowledge of current events (Tr. 873).   Gail R. Gerstenlauer, M.A. noted Plaintiff's report of concentrational problems but observed that Plaintiff was "very focused upon issues of pain management, and issues of how much medication, and the type of medication he will be receiving" (Tr. 877-878).    He was diagnosed with anxiety and personality disorders (Tr. 881).  Plaintiff again attributed his memory problems to a January, 2009 car accident, stating that he did not seek treatment after the accident due to his fear of being arrested and "locked up" (Tr. 867).  He walked with the use of a cane (Tr. 862).  Dr. Alessi noted the possibility of "malingering" (Tr. 855).  A physical examination was negative for muscle weakness (Tr. 845).  Plaintiff denied medication side effects (Tr. 845).  Progress notes state that Plaintiff was social "with peers and active in unit groups" (Tr. 839).  He used a cane, but was able to perform self care tasks without assistance (Tr. 839).  Plaintiff reported that he was "feeling better" (Tr. 835).  Later

-5-

the same month, Plaintiff reported a reduction in symptoms (Tr. 826).

MDOC treatment notes from the same month state "no progress" in Plaintiff's condition because "[h]e still seems to want things done for him without . . . putting in any effort" (Tr. 819). The following week, Dexter Fields, M.D. observed that Plaintiff continued "to appear as a malingerer" (Tr. 817). The same month, Plaintiff was given a medical accommodation resulting from a "functional impairment" (Tr. 808). Plaintiff reported auditory hallucinations and requested a wheelchair (Tr. 800, 805). In November, 2009, Plaintiff asked for a medication increase but declined to follow treating advice to exercise (Tr. 745).

January, 2010 MDOC treating records that Plaintiff reported side effects from psychotropic medication (Tr. 704). He appeared well groomed and was fully oriented (Tr. 700). He denied current audio hallucinations (Tr. 700). Treating records note a long criminal history including assault with a dangerous weapon, fraud, and stolen property (Tr. 680, 697). He was diagnosed with a psychotic disorder "due to traumatic brain injury with hallucinations" (Tr. 685). The following month, he reported an increase in auditory hallucinations (Tr. 672). March, 2010 therapy notes state that his group participation was fair to good in one session but poor in a later one (Tr. 644, 667). Physical treating notes from the same month state that imaging studies of the spine were negative for abnormalities (Tr. 651). Mental treatment notes state that Plaintiff played pool on a regular basis with a friend (Tr. 650). The following month, Plaintiff participated more frequently in group therapy (Tr.

-6-

643).  Plaintiff reported good results from therapy (Tr. 638, 640).  Plaintiff was noted to be "over using" his wheelchair (Tr. 631).  Treating notes from the following month note that it coninued "to be . . . extremely difficult [] to figure out as what is real and what is not" in terms of Plaintiff's psychological condition (Tr. 621).  The notes state that Plaintiff "overplay[ed]" his psychological problems (Tr. 621).

In July, 2010, Plaintiff attributed his depression to physical problems (Tr. 580-581).  Treating notes state that he overslept and over-ate (Tr. 580-581).  August, 2010 group therapy for anger management treating notes state that Plaintiff was attentive during the sessions and participated (Tr. 542-543).  In September, 2010, Roger A. Gerlach, M.D. noted that he "got nowhere as usual" when suggesting "less reliance on drugs and devices" (Tr. 531).

In October, 2010, Plaintiff exhibited psychological progress after attending group therapy (Tr. 506).  Treating notes from the same month state that Plaintiff experienced a hand injury while playing basketball (Tr. 505).  Therapy notes state that Plaintiff would be required to sustain "medication compliance" after release from prison (Tr. 493).  Notes from the following month state that Plaintiff was maintaining attention with a cooperative attitude (Tr. 487).  December, 2010 treating notes state that Plaintiff exhibited poor hygiene but a normal affect and mood (Tr. 446).  Ravi N. Polavarapu, M.D. noted good judgement and a normal affect but remarked that it was not clear why Plaintiff required the use of a wheelchair (Tr. 440-441, 444).

January, 2011 treatment notes state that Plaintiff knew "the names of each drug" he took and displayed average intelligence (Tr. 410, 412).  He exhibited good personal hygiene and had no misconduct tickets (Tr. 412).  He denied auditory hallucinations (Tr. 372). March, April, and May, 2011 records show good eye contact, personal hygiene, and concentration (Tr. 314-315, 326-327, 333-334, 340, 347, 353).  He reported no medication side effects or problems performing everyday tasks (Tr. 326).  A May, 2011 Mental Residual Functional Capacity Assessment by Dr. Polavarapu found the presence of schizoaffective disorder with depressive features due to multiple automobile accidents (Tr. 282-283).  June and July therapy notes state that Plaintiff exhibited "stable mood and behavior" (Tr. 285).

July, 2011 imaging studies of the testes were unremarkable (Tr. 1017, 1022, 1024). He exhibited a normal range of upper and lower extremity motion (Tr. 1021).  August, 2011 psychological intake records state that Plaintiff was fully oriented but experienced impaired memory and hallucinations (Tr. 999, 1121).  The intake records note Plaintiff's report of a 2009 automobile accident resulting in the need for a wheelchair and the need for narcotic pain medication (Tr. 995).  Treating records by Kalif Khan, M.D. note the possibility of malingering (Tr. 993, 1127).

 In January, 2012, Plaintiff exhibited a normal range of motion (Tr. 1148).  Treating notes from the same month by Daniel Dorman, D.O. state that Plaintiff attempted to procure prescriptions for Vicodin and Panax (Tr. 1195).  A January, 2012 CT of the brain showed "no acute intra cranial abnormality" or evidence of brain trauma (Tr. 1158).  A March, 2012 MRI

-8-

of the lumbar spine showed mild degenerative changes (Tr. 1130-1131).  An MRI of the cervical spine was unremarkable (Tr. 1133).  April, 2012, treating records state that Plaintiff was able to "manage" auditory hallucinations (Tr. 1069).  In May, 2012, neurologist Allan G. Clague, M.D. found that Plaintiff was disabled as a result of closed head injuries sustained in the 2005 and 2009 car accidents (Tr. 1038-1042).  Dr. Clague noted that Plaintiff's report of a poor appetite and memory (Tr. 1038-1039).  Treating notes from the same month state that Plaintiff exhibited good hygiene and denied hallucinations (Tr. 1080, 1085).  Treating notes from August, 2012 state that Plaintiff's depression was under control (Tr. 1078).

In January, 2013, Dr. Clague recommended a "pain treatment program" for Plaintiff (Tr. 1063).  Dr. Clague completed a work-related abilities assessment finding that Plaintiff would be unable to walk more than one-quarter of a block, sit for more than 10 minutes, or stand for more than five (Tr. 1250).  He found that Plaintiff required a sit/stand option (Tr. 1250).  He found that Plaintiff would require up to three-hour breaks at unpredictable intervals (Tr. 1250).  Dr. Clague opined that Plaintiff was limited to lifting less than 10 pounds on a "rare" basis and was incapable of even low stress work (Tr. 1251-1252)

The same month, P.Lamont Okey, M.D. observed shaking of the lower and upper extremities but an appropriate mood and effect (Tr. 1213).  The following month, an ultrasound of the testes was negative for masses (Tr. 1197, 1201, 1221).  In February, 2012 urologist Tony Pinson, M.D. noted an "appropriate mood and affect" (Tr. 1204, 1206).

In March, 2013 Murata Syed, M.D. completed a "Medical Impairment Questionnaire,"

-9-

finding that Plaintiff was psychologically unable to meet competitive standards in a number of work-related functions (Tr. 1232-1233). Dr. Syed found the presence of "marked" restriction in activities of daily living and "extreme" limitation in maintaining social functioning and concentration, persistence, or pace (Tr. 1234). He found that Plaintiff's psychological symptoms would result in more than four absences each month (Tr. 1235). He found that substance abuse did not contribute to Plaintiff's limitations (Tr. 1235). Dr. Syed's treating records note Plaintiff's report that he slept well and that depression was "manageable" (Tr. 1237).

The same month, Herbert Malinoff, M.D. examined Plaintiff on behalf of Dr. Okey, recommending inpatient treatment for "withdrawal from sedating medications" (Tr. 1242). Dr. Malinoff noted that Plaintiff had not had psychiatric inpatient treatment despite claims of a "schizo-affective disorder" (Tr. 1243). He diagnosed Plaintiff with opioid dependency, suspected "opiate induced hyperalgesia," "sedative withdrawal syndrome," polypharmacy, mood disorder, cognitive impairment "possibly on the basis of medication [] withdrawal," and traumatic brain injury (Tr. 1245).

### 2.  Non-Treating Records

In December, 2011, George Starrett, Ed.D. reviewed the psychiatric records, determining that Plaintiff experienced mild restriction of actitivies of daily living and social functioning and moderate limitation in concentration persistence, or pace (Tr. 106). In February, 2012, R. Scott Lazzara, M.D. performed a consultative physical examination

noting Plaintiff's claim of a 2009 car accident (Tr. 1030). Plaintiff displayed intact memory and concentration (Tr. 1031). He exhibited mild difficulty getting out of his wheelchair but normal motor strength (Tr. 1031, 1033). Dr. Lazzara found that "short term," the use of a cane and wheelchair do appear helpful" (Tr. 1034). He noted that Plaintiff's orthopedic condition appeared "relatively stable" (Tr. 1034). Plaintiff exhibited a "wide based, slow shuffling gait" requiring the use of a cane (Tr. 1033). In February, 2012, Shahida Hohiuddin, M.D. conducted a non-examining review of the medical records, finding that Plaintiff's physical conditions did not create work-related limitations (Tr. 87, 92). He found Plaintiff's complaints of "dubious legitimacy" (Tr. 92).

### D.   Vocational Testimony

The ALJ posed the following hypothetical question to VE Charles McBee, taking into account Plaintiff's age, education, and work background:

> [A]ssume a hypothetical individual . . . has the residual functional capacity for sedentary[1] work with postural limitations of no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and environmental limitation to avoid all exposure to hazards, such as moving machinery and unprotected heights. The work should be limited to simple routine and repetitive tasks in a work environment free of fast paced production requirements involving only

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

> work related decisions with few, if any, work place changes. There should be only occasional interaction with the general public, coworkers, and supervisors. Mr. McBee, would an individual with that residual functional capacity be able to perform [Plaintiff's] past relevant work . . .? (Tr. 75).

The VE testified that the hypothetical limitations would preclude Plaintiff's former jobs but would allow for the sedentary, unskilled jobs of table worker (1,000 jobs in the regional economy); "waxer of glass products," (1,000); and document preparer (15,000) (Tr. 76). The VE testified that sedentary work would allow the individual to elevate his legs a maximum of 12 inches (Tr. 77) The VE testified further that if the same individual were also absent from work four times each month, or, were off task 20 percent or more of the workday, all work competitive work would be precluded (Tr. 77). He stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 77).

## E.    The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "schizoaffective disorder; closed head injury; anxiety disorder, not otherwise specified; chronic pain syndrome; physiologic opioid dependence; status-post traumatic brain injury; polypharmacy; sedative withdrawal syndrome; suspected opiate induced hyperalgesia; and cognitive impairment" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 25-26). He determined that Plaintiff experienced mild restriction in activities of daily living and moderate restriction in social functioning and concentration, persistence, or pace (Tr. 26-27). The ALJ found that

-12-

Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally sedentary work within the following parameters:

> [N]o climbing of ladders, stooping, kneeling, crouching, and crawling; environmental limitation to avoid all exposure to hazards such as moving machinery and unprotected heights; work should be limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only work-related decisions, with few if any workplace changes; and only occasional interaction with the general public, coworkers, and supervisors (Tr. 28).

Citing the VE's testimony, the ALJ concluded that Plaintiff could perform the sedentary work of a table worker, waxer of glass products, or a document preparer (Tr. 42).

In a 12-page credibility determination, the ALJ noted that the treating records created during and after Plaintiff's prison stint stood at odds with the allegations of disability (Tr. 41). The ALJ noted that while Plaintiff alleged disability as a result of 2005 and 2009 automobile accidents, he did not receive any treatment after the 2009 accident (Tr. 30). The ALJ observed that "various treating sources suspected on more than one occasion that [Plaintiff] was malingering" (Tr. 30-31). The ALJ cited Dr. Khan's finding that Plaintiff "'had learned how to use the system and is malingering'" (Tr. 31). The ALJ cited prison health records showing that Plaintiff was able to walk and "'stopped shaking'" when distracted by questions from health care providers (Tr. 31-32). He cited prison records stating that Plaintiff "shakes when people are in his audience . . . . [but] when personnel leave the room, he does not exhibit this behavior at all'" (Tr. 32). The ALJ noted that Plaintiff maintained good hygiene while in prison (Tr. 37). He cited prison records showing that Plaintiff was able to play pool and was injured when someone stepped on his hand while

-13-

playing basketball (Tr. 37).

The ALJ observed that following Plaintiff's release from prison, unremarkable x-rays of the cervical spine stood at odds with the claims of upper extremity radiculopathy (Tr. 33). He noted that Plaintiff had been assessed with opiate-induced hyperalagesia (Tr. 33). As to the cognitive disorders, the ALJ noted that imaging studies of the brain had been unremarkable (Tr. 33-34). The ALJ noted that Dr. Lazzara's observation of good concentration and a normal memory undermined Plaintiff's allegations of extreme psychological limitation (Tr. 35). Although Plaintiff testified that he experienced auditory hallucinations, the ALJ noted that prison records and Dr. Khan's notes showed the absence of psychosis (Tr. 35). The ALJ observed that Plaintiff had not required in-patient psychiatric hospitalizations or emergency room visits (Tr. 36).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

-14-

without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes several arguments for remand.  First, he contends that the ALJ erred by declining to adopt the disability opinions by Drs. Clague and Syed.  *Plaintiff's Brief,* 17-20, *Docket #14.*  Plaintiff also faults the ALJ for failing to discuss the weight accorded the records of prison physicians Drs. Lee and Polavarapu.  *Id.* at 20-21.  Third, Plaintiff disputes the finding that the use of a wheelchair "was evidence of malingering." *Id.* at 21-23.  Finally, he takes issue with the ALJ's inclusion of "opioid dependence, sedative withdrawal syndrome, and suspected opiate induced hyperalgesia" among the "severe" impairments at Step Two of the sequential analysis.  *Id.* at 23-24.

Plaintiff's challenge to the finding that he was malingering is partially dispositive of the remaining issues and will thus be considered first.

### A.    Plaintiff's Use of a Wheelchair

Plaintiff disputes the finding that he did not require the use of a wheelchair and the overall conclusion that he was a malingerer.  *Plaintiff's Brief* at 21-23 (citing Tr. 31) .  He contends that his need for a wheelchair is supported by Drs. Clague and Okey's treatment notes as well as Dr. Lazzara's consultative examination remark that "'the use of a cane and wheelchair do appear helpful.'" *Id.* at 22 (citing 1038).

The ALJ supported the finding that Plaintiff did not require the use of a wheelchair by citing prison records showing that he was able to walk (Tr. 31).  The ALJ noted that at

various times, Plaintiff offered inconsistent reasons for the need for a wheelchair, observing that he claimed he needed the chair because of "scrotal pain," while on another occasion for right leg problems, and on yet another for *left* leg problems (Tr. 31). The ALJ cited treatment records stating that Plaintiff did not require the use of a wheelchair (Tr. 32). While Plaintiff argues that he required the use of a wheelchair for balance problems brought on by a neurological injury, the ALJ noted that a cerebellar function examination revealed normal coordination, gait, and balance (Tr. 31). The ALJ also noted that a cranial nerve examination was normal (Tr. 31). He cited treating records stating that Plaintiff exhibited muscular tremors "'when people are in his audience'" which resolved when he believed that he was alone (Tr. 32). The ALJ noted that while Plaintiff was eventually prescribed a wheelchair, medical staff observed that he was "overusing" the wheelchair (Tr. 32).

The ALJ also noted that Plaintiff's accounts of the 2009 car accident resulting in neurological injuries were inconsistent and unsupported by contemporaneous treating records (Tr. 32). The ALJ noted that after the prison release, Plaintiff "generally presented for treatment in a wheelchair and treating sources appeared to accept that it was a medical necessity" (Tr. 32). However, the ALJ noted that Plaintiff was seen pedaling the "wheelchair with his feet" and that an examination by Dr. Okey found "normal range of motion, muscle strength, and stability in all extremities" (Tr. 33). The ALJ noted that the January, 2012 CT of the brain showing no intra cranial abnormalities (Tr. 33). He noted that imaging studies of the lumbar spine likewise failed to confirm Plaintiff's alleged lower extremity

-17-

neurological problems (Tr. 34).

My own review of the extensive medical record supports these findings. Prison treating records state that Plaintiff exhibited a normal gait (Tr. 964) and that he shook "throughout" a doctor's appointment until the physician "distracted him with questions . . ." (Tr. 962). Treating staff observed on another occasion that Plaintiff "intentionally" shook in front of others but did not when he believed he was alone (Tr. 916). Prison records showing that Plaintiff's hand was injured when someone stepped on it during a basketball game undermine his claim of physical limitation and the need for a wheelchair (Tr. 505). The ALJ's heavy reliance on the MDOC records is particularly appropriate, given that staff members were able to monitor Plaintiff's daily activities on a regular and sustained basis.

I also agree with the ALJ's take on the post-incarceration records. While following Plaintiff's release from prison, treating and consultative sources did not challenge the purported need for a wheelchair, little if any objective evidence supports such a need. The ALJ noted that while Dr. Okey granted Plaintiff's request for a wheelchair, the treating notes from that time indicate normal muscle strength and stability (Tr. 33). While Plaintiff argues that his chronic low extremity weakness is attributable to a brain injury, none of the treating or examining records show the presence of the muscle atrophy to be expected of a wheelchair bound individual.

Because the ALJ's determination that Plaintiff did not require the use of wheelchair is well supported by the record, it should remain undisturbed by this Court. "[A]n ALJ's

-18-

credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" "*Cruse v. Commissioner of Social Sec., 502 F.3d 532, 542* (6th Cir.2007*)(citing Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)); *See also Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen,* 868 F.2d 921, 927 (7th Cir.1989)(*citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

### B.    The Treating Physician Analysis

Plaintiff also argues that the ALJ erred by declining to adopt the 2013 disability opinions by Drs. Clague and Syed.  *Plaintiff's Brief* at 17-20.  He also contends that ALJ erred by failing to state the weight assigned to the opinions of MDOC physicians Drs. Lee and Polavarapu.  *Id.* at 20-21.

### 1.  Applicable Law

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004).  Further,

-19-

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

*Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6)).

The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error.  *Gayheart v. Commisioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013)(citing *Wilson,* at 544-446).   "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir.2011); § 404.1527(c)(2).  "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart,* at 376 (citing SSR 96-2p, 1996 WL 374188, *5 (1996)).  However, in the presence of contradicting substantial evidence, an ALJ may reject all or a portion of the treating source's findings. *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391-392 (6th Cir.2004).

## 2.  Drs. Clague and Syed

Contrary to Plaintiff's argument, the ALJ's rejection of the treating sources is well supported and explained.   The ALJ acknowledged Dr. Clague's status as a neurologist but noted that the findings of extreme physical and psychological limitation (Tr. 1038-1042,

1250-1252) were undermined by Dr. Clague's lack of access to the MDOC records (Tr. 39). The ALJ noted that the MDOC records (unreviewed by Dr. Clague) provided "good reason for questioning the reliability of [Plaintiff's] subjective complaints" (Tr. 39).   The ALJ reasonably found that Dr. Clague's finding of the need for a wheelchair and other limitations was based on Plaintiff's subjective complaints, observing that Plaintiff's claim that he had not been able to walk since his first car accident in 2005 was flatly contradicted by the MDOC records (Tr. 39).  The ALJ noted that Dr. Clague's finding of cognitive problems due to a neurological injury stood at odds with an unremarkable CT of the brain (Tr. 39).

The rejection of Dr. Syed's March, 2013 assessment is also well supported and articulated.  The ALJ noted that Dr. Syed's disability finding of "extreme" psychological limitation was contradicted by his own records stating that the symptoms of depression were manageable (Tr. 39-40).  The ALJ also noted that the records by Drs. Okey and Khan showing only mild to moderate symptoms stood at odds with a finding of extreme limitation (Tr. 39-40).

The ALJ did not err in finding that significant portions of the medical transcript contradicted Dr. Syed's assessment.  Following Plaintiff's release from prison, Dr. Khan (considering Plaintiff's allegations of the need for a wheelchair and prescription painkillers) noted the possibility of malingering  (Tr. 993, 1127).  An MRI of the cervical spine was unremarkable (Tr. 1122).  Plaintiff reported in April, 2012 that he was able to cope with auditory hallucinations and in August, 2012 stated that his depression was under control (Tr.

-21-

1078).  Dr. Syed's March, 2013 finding of extreme psychological limitations is contradicted

by Drs. Okey and Pinson's February, 2013 findings of an appropriate mood and affect (Tr.

1204, 1206, 1213).  Most significantly, Dr. Syed's findings are contradicted by his own

treating notes from the same month stating that Plaintiff's depression was "manageable" (Tr.

1237).

### 3.  The Findings by the MDOC Physicians

Plaintiff also faults the ALJ for failing to state the weight accorded to MDOC

psychiatrists Drs. Lee and Polavarapu.  *Plaintiff's Brief* at 20-21.  He cites Drs. Lee's and

Polavarapu's observations that Plaintiff appeared anxious, bit his fingernails, and reported

auditory hallucinations.  *Id.* at 20 (citing 296-283).  However, because the observations by

these physicians do not constitute "opinions" as to Plaintiff's functional capacity, the treating

physician rule does not apply.  Hence, the ALJ is not required to articulate their "weight" in

making the disability determination.  *See Bennett v. CSS*, 2011 WL 1230526 (W.D. Mich.

March 31, 2011)(doctor's observation, unaccompanied by an assessment of functional

limitations not a "medical opinion"); *Winter v. CSS,* 2013 WL 4604782 (E.D. Mich. August

29, 2013)(diagnosis, by itself, does not constitute an "opinion").  Accordingly, the ALJ's

claimed failure to apply the treating physician rule to Dr. Lee's and Dr. Polavarapu's findings

does not constitute error.

Further, it bears repeating that the MDOC records strongly undermine the disability

claim.  September, 2009 treating notes state that while Plaintiff alleged extreme memory

-22-

impairment, he exhibited good concentrational abilities when talking about his prescribed medication and dosage (Tr. 877-888).  He was able to perform self care tasks (Tr. 839).  In October, 2009, Dr. Fields noted that Plaintiff appeared to be malingering (Tr. 817).  March, 2010 records suggest that Plaintiff exaggerated his psychological problems (Tr. 621)  In December, 2010, Dr. Polavarapu questioned Plaintiff's alleged need for a wheelchair (Tr. 440-441, 444).  Plaintiff was able to play pool regularly and avoided misconduct tickets (Tr. 412, 650).  June and July, 2011 notes state that Plaintiff exhibited "stable mood and behavior" (Tr. 285).  Moreover, the fact that the ALJ did not discuss every page of the 1000-page medical transcript does not provide grounds for remand.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508-9 (6th Cir.February 9, 2006)(no requirement that the ALJ discuss every scrap of evidence in the administrative record).

### C.    The Severe Impairments

Finally, Plaintiff disputes the ALJ's finding that "physiologic opioid dependence, polypharmacy, sedative withdrawal syndrome, and suspected opiate induced hyperalgesia" were "severe" impairments.  *Plaintiff's Brief* at 23-24.  Plaintiff contends that the above diagnoses are supported only by Dr. Malinoff's March, 2013.  *Id.* (citing Tr. 1244-45).  Plaintiff argues that because Dr. Malinoff examined him on only one occasion, his diagnoses were not entitled controlling weight.  *Id.*  Plaintiff argues further that Dr. Malinoff's diagnoses are contradicted by other portions of the report noting the absence of "intoxication or withdrawal."  *Id.* at 24.

-23-

Substantial evidence supports the ALJ's finding that "physiologic opioid dependence, polypharmacy, sedative withdrawal syndrome, and suspected opiate induced hyperalgesia" were "severe" impairments (Tr. 25).   Plaintiff points out that the medical records do not otherwise state such diagnoses.   While the record does not list the diagnoses *verbatim,* the record generously supports Dr. Malinoff's conclusions that Plaintiff experienced the symptoms of drug abuse.   Plaintiff's father testified that he monitored his son's medication dosage and was the designated payee for state benefits because he was a "trustworthy" individual (Tr. 70-71).   While Plaintiff alleged extreme cognitive limitations, he immediately became "very focused" when discussing his alleged need for prescription pain killers and knew "the names of each drug" he was taking (Tr. 877-878, 410, 412).   In September, 2010, Dr. Gerlach noted that Plaintiff had been repeatedly advised to become less reliant on drugs (Tr. 531).   Therapy notes from the next month state that "medication compliance" was required upon Plaintiff's release from prison (Tr. 493).   Dr. Malinoff's findings are all the more notable given that he did not have access to any of the extensive MDOC records showing a history of drug seeking behavior.   Moreover, although he did not review the MDOC records, Dr. Malinoff supported his findings with other treating source evidence.   Dr. Malinoff noted that Plaintiff had recently sought "more Tramadol" from Dr. Okey (Tr. 1245). He noted that at the same time, prescriptions for hydrocodone, Tylenol with codeine, and Vicodin had been filled (Tr. 1245).

Contrary to Plaintiff's additional argument, Dr. Malinoff's observation that Plaintiff

did not exhibit symptoms of intoxication or withdrawal *during the examination* (Tr. 1244) does not undermine his ultimate conclusion that Plaintiff experienced opioid dependence, drug seeking behavior, or symptoms consistent with the overuse of narcotics. Because Dr. Malinoff's diagnoses are supported by both his own findings and the record as a whole, the ALJ did not err in finding that the diagnoses met the *de minimis* Step Two standard. *See Farris v. Secretary of HHS,* 773 F.2d 85, 89-90 (6th Cir.1985)(*citing Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)(a Step Two a "severe" condition refers to any condition that would have more than a minimal effect on the claimant's work abilities). Because substantial evidence supports the conclusion that these conditions would have a significant effect on Plaintiff's work ability, the ALJ did not err in finding that they were "severe."

In closing, I note that my recommendation to uphold the Commissioner's decision should not be read to trivialize Plaintiff's personal difficulties. However, because the ALJ's determination was well within the "zone of choice" accorded the administrative fact-finder, it should be remain undisturbed. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen _____
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: June 9, 2015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on June 9, 2015, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla _____
Case Manager to the
Honorable R. Steven Whalen

-26-